United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 28, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

))))))))))))))))))))))))))))

No. 04-60897

))))))))))))))))))))))))))))

ALMA RITA MALAGON DE FUENTES,

Petitioner,

v.

ALBERTO R. GONZALES, U S ATTORNEY GENERAL,

Respondent.

---

Petition for Review from an Order of the
Board of Immigration Appeals
No. A43 788 874

---

Before JONES, Chief Judge, and WIENER and PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

The journey of Petitioner Alma Rita Malagon de Fuentes, from Mexico to the United States, then to Mexico and back again brought her to an odd legal intersection. While Petitioner would not have been deportable had she stayed in the United States, her leaving rendered her inadmissible upon return. And, because Petitioner returned when she did, relief was not available. For the reasons that follow, the decision of the Board of Immigration Appeals ("BIA") is AFFIRMED.

1

I.

Petitioner, a native and citizen of Mexico, claims she first came to the United States in 1982. She married, and her husband filed an I-130 petition on her behalf in August 1987. The INS approved the petition in September 1987, and Petitioner became a Lawful Permanent Resident ("LPR") on December 15, 1992. She had four children, all born in the United States.

On July 31, 1999, Petitioner was convicted of theft of property between $1,500 and $20,000 in a welfare fraud. She received five years of deferred adjudication for the felony.

In August 1999, Petitioner traveled to Mexico for a day. She did so with permission from her state probation officer. On August 21, 1999, she requested admission to the United States as a returning LPR. The Immigration and Naturalization Service ("INS") issued a Notice to Appear charging Petitioner as an "arriving alien" inadmissible under section 212(a)(2)(A)(i)(I) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1182(a)(2)(A)(i)(I), for having committed a crime "involving moral turpitude."[1] On October 26, 2000, an immigration judge determined Petitioner was removable as an "arriving alien" and

---

[1] The provision lists "any alien convicted of . . . acts which constitute the essential elements of . . . a crime involving moral turpitude" as among those ineligible to be admitted to the United States. 8 U.S.C. § 1182(a)(2)(A)(i)(I). Petitioner does not dispute that her felony is a crime "involving moral turpitude."

ineligible for a waiver of admissibility under 8 U.S.C. § 1182(h).  The immigration judge ordered her removed from the United States.

Petitioner appealed.  On December 17, 2002, the BIA adopted and affirmed the immigration judge's decision.  Petitioner filed a writ of *habeas corpus* in federal district court.  On February 24, 2004, a magistrate judge recommended transferring the case to this court for direct review.  On September 30, 2004, the district court transferred the case and stayed Petitioner's claims in *habeas*.

## II.

We have jurisdiction to review Petitioner's constitutional claims.  8 U.S.C. § 1252(a)(2)(D); see Hadwani v. Gonzales, 445 F.3d 798, 800 (5th Cir. 2006).

## III.

The first question is whether the BIA erred in upholding the immigration judge's determination that Petitioner was seeking admission to the United States as defined in 8 U.S.C. § 1101(a)(13)(C)(v).  The statute provides that "[a]n alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien . . . has committed an offense identified in section 1182(a)(2) of this title."  There is no dispute as to whether Petitioner's

crime is such an offense. She argues she cannot be considered an "arriving alien" under the "Fleuti doctrine," see Rosenberg v. Fleuti, 374 U.S. 422 (1963), and that considering her one raises constitutional concerns. The government responds that the doctrine was superseded by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), and that Petitioner's case does not raise constitutional concerns.

## A. IIRIRA and Fleuti

Before IIRIRA's passage, 8 U.S.C. § 1101(a)(13) defined "entry" as:

> [A]ny coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary.

Fleuti, 374 U.S. at 452. The Fleuti doctrine refers to the Supreme Court's determination that a resident alien did not effect an entry returning from "'an innocent, casual, and brief excursion' outside the United States; instead such an alien effects an entry only if he intended to depart in a manner 'meaningfully interruptive' of the alien's permanent residence." Carbajal-Gonzalez v. INS, 78 F.3d 194, 198 (5th Cir. 1996) (quoting Fleuti, 374 U.S. at 462). Petitioner argues this

4

doctrine continues to apply, and that she cannot be considered to be entering the United States because she did not intend to "meaningfully [interrupt]" her residence.

Despite the innocent and brief nature of her trip to Mexico,[2] Petitioner can be considered an arriving alien. IIRIRA superseded the Fleuti doctrine and its intent test when the act replaced the above-quoted provision with the current § 1101(a)(13)(C).[3] The plain language of the statute does not allow for the exception found by the Court in Fleuti.[4] See Betancourt-Parga v. Ashcroft, 126 F. App'x 165 (5th Cir. 2005)(per curiam)("Fleuti . . . has been superceded by the enactment of certain [IIRIRA] provisions in cases involving suspension of

---

[2] Petitioner went to Mexico to deliver food and medicine to her parents, who lived in the anticipated path of Hurricane Brett.

[3] The provision reads, in pertinent part: "[a]n alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien . . . has committed an offense identified in section 1182(a)(2) of this title."

[4] Petitioner argues that § 1101(a)(13)'s language does not require that she be deemed to be seeking admission. She points to the placement of the word "unless," reading it as establishing only a necessary condition for the identification of an LPR as seeking admission. Petitioner asserts that this construction leaves open the possibility that a person in her position could be deemed not to be seeking admission. Even assuming the provision reads as she suggests, it in no way precludes the identification of an LPR who has committed a listed offense as seeking admission. Petitioner claims the discretion not to identify her as seeking admission should be exercised because her case implicates constitutional concerns. We address these concerns in the paragraphs that follow.

5

deportation"). Our conclusion regarding IIRIRA's effect on the Fleuti doctrine is consistent with those of our sister circuits. See, e.g., Tapia v. Ashcroft, 351 F.3d 795, 799 (7th Cir. 2003)("The Fleuti doctrine . . . has been superseded by the IIRIRA"); Tineo v. Ashcroft, 350 F.3d 382, 394 (3rd Cir. 2003)("Congress has also set forth six scenarios under which a returning lawful permanent resident may not retain that status. In those scenarios, where Congress has deemed Fleuti doctrine irrelevant, § 301(a)(13) cannot be read to permit an inquiry into the alien's intent."); see also Rivera-Jimenez v. INS, 214 F.3d 1213, 1218 n.6 (10th Cir. 2000) (noting absence of "brief, casual, and innocent and did not meaningfully interrupt the continuous physical presence" provision for calculating residence period in IIRIRA).

Even if the effect of IIRIRA on the Fleuti doctrine were not so plain, the deference we accord the BIA regarding its construction of immigration law yields the same result. In *In re Collado*, the BIA concluded that the Fleuti doctrine did not survive IIRIRA's passage. 21 I. & N. Dec. 1061, 1064-66 & n.3 (BIA 1998).[5] Under Chevron, U.S.A., Inc. v. Natural Resources

_____

[5] "Congress has directed that a returning lawful permanent resident who is described in sections 101(a)(13)(C)(i)-(vi) of the Act shall be regarded as 'seeking an admission' into the United States, without regard to whether the alien's departure from the United States might previously have been regarded as 'brief, casual, and innocent' under the Fleuti doctrine." Id. at 1066.

6

<u>Defense Council, Inc.</u>, we subject the BIA's construction of the law it administers to a deferential review. <u>Salazar-Regino v. Trominski</u>, 415 F.3d 436, 442 (5th Cir. 2005)(citing <u>Chevron</u>, 467 U.S. 837 (1984)). This review involves a two-step inquiry. First, we ask whether Congress has directly spoken to the precise question at issue. If Congress' intent is clear, the agency and the courts are bound to give effect to it. <u>Id.</u> at 443 (quoting <u>Moosa v. INS</u>, 171 F.3d 994, 1005 (5th Cir. 1999)). If the statute is silent or ambiguous with respect to the specific issue, we ask the second question, whether "the agency's answer is based on a permissible construction of the statute." <u>Id.</u> As discussed above, we find the statute's language to be clear. Even were it not, Petitioner's observation–that the placement of the word "unless" allows for the logical possibility of an LPR who has committed one of the listed offenses not being deemed to seek admission–does not render the BIA's reading of the statute impermissible. The statute's command that an LPR "shall not" be regarded as seeking admission "unless" she has committed a crime of moral turpitude certainly permits the determination of an LPR who has committed such a crime as seeking admission. Even if we agreed with Petitioner's reading, to hold otherwise would be to "simply impose [this court's] own construction on the statute, as would be necessary in the absence of an administrative interpretation." <u>Id.</u> at 443. <u>Chevron</u> commands we not go so far.

7

B. Constitutional Objections

Petitioner raises constitutional objections to the determination of her as an arriving alien.  These take a variety of forms,[6] but boil down to an argument that her treatment violates a nebulous "constitutional core" of <u>Fleuti</u> and the Fifth Amendment Due Process Clause's guarantees of equal protection and due process.[7]

Petitioner argues that <u>Fleuti</u>, while nominally based on statutory grounds, in fact reaffirmed a "constitutional core" of fair treatment of immigrants that courts had applied prior to § 101(a)(13)'s enactment in 1952.  In tracing the Congressional intent behind the statute, the <u>Fleuti</u> Court did indeed review the caselaw preceding the INA's enactment, in particular the judicially-developed definition of "entry."  <u>Fleuti</u>, 374 U.S. at 453.  In several instances, judges had endeavored to ameliorate the rather harsh definition adopted by the Court in <u>United States</u>

---

[6] Petitioner argues, among other things, that (1) IIRIRA's passage could not and did not overrule the alleged "constitutional core" of <u>Fleuti</u>; that (2) the doctrine of constitutional avoidance requires that § 1101(a)(13)(C) be read so as to avoid any constitutional concern; and (3) that the BIA's interpretation of the statute in <u>In re</u> Collado does not apply because that case did not raise the constitutional issues presented here.

[7] <u>See</u> U.S. CONST. amend. V, § 3 ("No person shall . . . be deprived of life, liberty, or property, without due process of law").  "The Fifth Amendment applies to the federal government a version of equal protection largely similar to that which governs the states under the Fourteenth Amendment."  <u>Rodriguez-Silva v. INS</u>, 242 F.3d 243, 247 (5th Cir. 2001).

8

*ex rel* Volpe v. Smith, 289 U.S. 422 (1933), which excluded even long-standing resident aliens who left only briefly. Id. at 453-460 (citing Carmichael v. Delaney, 170 F.2d 239 (9th Cir. 1948); Yukio Chai v. Bonham, 165 F.2d 207 (9th Cir. 1947); Del Guercio v. Delgadillo, 159 F.2d 130 (9th Cir. 1947); and Di Pasquale v. Karnuth, 158 F.2d 878 (2nd Cir. 1947)). The Fleuti court's discussion of these opinions, which preceded Congress' passage of § 101(a)(13), does not evince any "constitutional core." In Di Pasquale and Delgadillo, the primary cases discussed in Fleuti, the judges looked to Congress and its intent to ameliorate a judicial rule. Fleuti, 374 U.S. at 455-56. Nowhere in this Fleuti discussion is the Constitution even mentioned.[8] Fleuti is properly read as a case of statutory interpretation, and the statute it interprets has been amended. No "constitutional core" has been violated in this case.

With respect to equal protection, Petitioner claims that §

---

[8] In *dicta* supporting the general thrust of its result, the Fleuti Court did refer to its holding in Kwong Hai Chew v. Colding, that a returning resident alien is entitled as a matter of due process to a hearing on the charges underlying any attempt to exclude him. 344 U.S. 590, 600 (1953). Even if it were considered part of the "constitutional core" to which Petitioner refers, Kwong Hai would be of no assistance here. That case involved a procedural due process challenge to the government's detention of an alien without a hearing. Id. at 602-603. There is no allegation that Petitioner was deprived of a hearing, and indeed she has had several. To the extent Kwong Hai stands for the broad proposition that LPRs have constitutional rights, which they do, the case is not helpful here. The question is the character of those rights, and Fleuti does not speak to it.

9

1101(a)(13) is unconstitutional as-applied because there is no rational basis to distinguish between LPRs who have committed offenses under § 1182(a)(2)and left the country briefly and those who have also committed the offenses but have not left. Having left the country renders the former category inadmissible even though they might not be deportable under 8 U.S.C. § 1227(a)(2).[9]

We subject the classification at issue to rational basis review. Because Petitioner's claim attacks a congressionally-drawn distinction among aliens, our equal protection review is necessarily narrow; for "over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." Rodriguez-Silva, 242 F.3d at 246 (quoting Fiallo v. Bell, 430 U.S. 787 (1977) (punctuation omitted); see also Castillo-Alvaros v. Gonzales, 136 F. App'x 629, 630 n.4 (5th Cir. 2005)(per curiam)("Congress may make classifications of aliens as long as it has a facially legitimate reason for making the distinction"). Indeed, "the federal government can enact legislation that would be invalid under the Fourteenth Amendment if enacted by a State, particularly if the legislation relate[s]

---

[9] This provision allows the Attorney General to deport, among others, aliens who have committed crimes of moral turpitude. However, such a person is defined as "[a]ny alien who (I) is convicted of a crime involving moral turpitude committed within five years (or 10 years in the case of an alien provided lawful permanent resident status under section 1255(j) of this title) after the date of admission, and (II) is convicted of a crime for which a sentence of one year or longer may be imposed."

10

to immigration." Id. at 247. We thus apply rational basis review to Petitioner's claims. Madriz-Alvarado v. Ashcroft, 383 F.3d 321, 332 (5th Cir. 2004).

Rational basis review begins with a strong presumption of constitutional validity. Flores-Ledezma v. Gonzales, 415 F.3d 375, 381 (5th Cir. 2005)(citing Heller v. Doe, 509 U.S. 312, 319 (1993)). It is Petitioner's burden to show that the law, as-applied, is arbitrary; and not the government's to establish rationality. Kite v. Marshall, 661 F.2d 1027, 1030 (5th Cir. 1981). "Under rational basis review, differential treatment 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" Madriz-Alvarado, 383 F.3d at 332 (quoting FCC v. Beach Commc'ns, 508 U.S. 307 (1993)). Petitioner argues that Congress has proffered no reason to distinguish between an LPR not subject to deportation who leaves the United States briefly for innocent purposes and one who did not leave.

The lines drawn here by Congress separate LPRs who have committed violations from those who have not, and those who remain in the country from those who do not. Congress' choice to disfavor the admission of aliens who have committed offenses is not irrational. See Giusto v. INS, 9 F.3d 8, 10 (2nd Cir. 1993) (upholding § 1182(c)'s making discretionary relief unavailable to

11

alien who has committed certain crimes against equal protection challenge).  Nor is its decision to make getting into the United States more difficult than remaining.  See, e.g., Gisbert v. U.S. Att'y Gen., 988 F.2d 1437, 1440 (5th Cir. 1993) (noting "[a]liens subject to deportation generally are granted greater substantive rights than are excludable aliens"); Alvarez-Garcia v. Ashcroft, 378 F.3d 1094 (9th Cir. 2004) (determining equal protection not denied where excludable alien required to undergo sundry procedures for admission where deportable alien's claims would be considered in deportation hearing); but see Chuang v. U.S. Att'y Gen, 382 F.3d 1299 (11th Cir. 2004) (upholding against equal protection attack Antiterrorism and Effective Death Penalty Act's bar against discretionary relief for deportable aliens and allowance for such relief for excludable aliens).  That Petitioner, by dint of her decisions to commit welfare fraud and leave the country, finds herself doubly disadvantaged does not mean her constitutional rights have been violated.  Her innocent reason for departing the United States does not affect the constitutionality of Congress' law, or its application.

Petitioner likens her case to Francis v. INS.  532 F.2d 268 (2nd Cir. 1976).  In Francis, the Second Circuit determined that the BIA's interpretation of the INA deprived the petitioner of equal protection where it rendered him ineligible for discretionary waiver by virtue (or vice) of his conviction for a

12

marijuana offense. Because of the piecemeal way waiver had been applied to certain deportation proceedings, Francis would have been eligible had he left, and then re-entered, the United States. Id. at 269. "Fundamental fairness dictates," the court wrote, "that permanent resident aliens who are in like circumstances, but for irrelevant and fortuitous factors, be treated in a like manner." Id. at 273. Francis concerned a distinction drawn between aliens in deportation proceedings. Although the plain language of the provision at issue, § 212(c) of the INA, was limited to exclusion proceedings, several decisions had extended its application to certain deportation contexts.[10] The Second Circuit saw no reason to distinguish those deportation contexts from Francis'. Even if Francis were on point statutorily and retained its force in light of subsequent amendments, the case is of no aid to Petitioner. First, this Circuit has refused to extend the meaning of Francis to the distinction between aliens being deported and those being excluded, which is at issue here. See Requena-Rodriguez v. Pasquarell, 190 F.3d 299, 309 (5th Cir. 1999). Second, Petitioner's case is the obverse of Francis. She is disadvantaged because she left, not because she stayed. The case's reasoning, equating not departing with a strong tie to the United States

---

[10] The provision has since been amended. See 8 U.S.C. § 1182(c).

meriting better treatment, <u>Francis</u>, 532 F.2d at 273, does not apply here.  Where immigration is concerned, it is hardly irrational to attach legal detriment to leaving the country.

Petitioner also raises a substantive due process challenge to her designation as an arriving alien.  She argues that her liberty interests in staying in the United States and being with her children have been violated, and that her designation as arriving is fundamentally unfair.  To establish a substantive due process violation, a plaintiff must first both carefully describe that right and establish it as "deeply rooted in this Nation's history and tradition."  <u>Washington v. Glucksberg</u>, 521 U.S. 702, 720-21 (1997) (quoting <u>Moore v. East Cleveland</u>, 431 U.S. 494, 503 (1977)).  If the right is so deeply rooted—if it is fundamental—we subject it to more exacting standards of review. If it is not, we review only for a rational basis.  <u>Brennan v. Stewart</u>, 834 F.2d 1248, 1255-57 (5th Cir. 1988).

Petitioner has no "right" to be admitted to the United States.  <u>United States v. Lopez-Vasquez</u>, 227 F.3d 476, 484-85 (5th Cir. 2000).  And while parents do have certain fundamental rights with respect to their children,[11] beyond keeping her from the United States, Petitioner does not claim that the government has interfered with any such right.  She is welcome to take her

[11] <u>See, e.g.,</u> <u>Littlefield v. Forney Ind. Sch. Dist.</u>, 268 F.3d 275, 288 (5th Cir. 2001)(recognizing the care, custody and control of children as fundamental liberty interests).

14

children with her to Mexico.  Petitioner's predicament does not constitute a deprivation of substantive due process.  See, e.g., McCurdy v. Dodd, 352 F.3d 820, 827 (3rd Cir. 2003) ("[T]he Supreme Court has protected the parent only when the government directly acts to sever or otherwise affect his or her legal relationship with a child.  The Court has never held that governmental action that affects the parental relationship only incidentally . . . is susceptible to challenge for a violation of due process") (quoting Valdivieso Ortiz v. Burgos, 807 F.2d 6, 8 (1st Cir. 1986)).  To find a substantive due process violation of parental rights here would subject to strict scrutiny any attempt by the government to incarcerate or bar from entry into the country a parent with children, or child with parents, in the United States.  This cannot be the proper rule.  What Petitioner seeks is admission, and the government needs only a rational basis to enforce a law that bars her admission.  As discussed above, it has one.

Petitioner's fundamental unfairness argument is nothing more than her equal protection argument recast in substantive due process terms, and we reject it.

IV.

The second question is whether the BIA erred in concluding Fuentes was ineligible for a waiver of admissibility under §

15

1182(h).[12]  Petitioner's main argument is that her ineligibility deprives her of equal protection.  As discussed above, we conduct only rational basis review.  Petitioner makes two arguments that her ineligibility for waiver violates equal protection.  First, she asserts that, by requiring LPRs, but not "non-LPRs," to reside lawfully for seven years in order to be eligible for a § 1182(h) waiver, the statute denies her equal protection.  Petitioner asserts it is irrational to make LPRs ineligible for a waiver for which non-LPRs, who enter the country illegally, are eligible.  Every one of our sister courts to have addressed this question have upheld § 1182(h)'s apparent favoring of non-LPRs against equal protection attack.  See De Leon-Reynoso v. Ashcroft, 293 F.3d 633, 640 (3rd Cir. 2002); Jankowski-Burczyk v. I.N.S., 291 F.3d 172, 178 (2nd Cir. 2002); Lukowski v. I.N.S., 279 F.3d 644, 647-48 (8th Cir. 2002); Moore v. Ashcroft, 251 F.3d 919, 925 (11th Cir. 2001); Lara-Ruiz v. I.N.S., 241 F.3d 934, 947 (2nd Cir. 2001); Umanzor v. U.S.I.N.S., 178 F.3d 1286 (4th Cir.

---

[12] § 1182(h) allows for waivers of inadmissibility based on criminal and related grounds where the alien seeking waiver has a relationship with a United States citizen and provides, in pertinent part, that "[n]o waiver shall be granted under this subsection in the case of an alien who has previously been admitted to the United States as an alien lawfully admitted for permanent residence if either since the date of such admission the alien has been convicted of an aggravated felony or the alien has not lawfully resided continuously in the United States for a period of not less than 7 years immediately preceding the date of initiation of proceedings to remove the alien from the United States."  Id.

16

1999) (Table).  In doing, they have identified several different

rationales that might underlie the distinction.  We agree with

them that the law has a rational basis.

Second, and chiefly, Petitioner challenges the operation of

the statute as-applied, arguing there is no basis to deny the

waiver to LPRs inadmissible under § 1182(a)(2)(A)(i)(I) who leave

and return within 180 days of the end of the seven year period

when those who leave and remain outside the country are eligible.

The factual and legal basis for this claim requires explanation.

Petitioner became an LPR on December 15, 1992.  When she returned

from Mexico on August 21, 1999, she had roughly four months until

the seven year residence bar to waiver in § 1182(h) would cease

to apply.  Under § 1101(a)(13)(C)(ii), an LPR is not considered

to be seeking admission unless he or she has been absent from the

country for a continuous period in excess of 180 days.  Had

Petitioner remained in Mexico through the seven year anniversary

of her achievement of LPR status and then attempted to return,

she would not have exceeded 180 days, and thus not been

considered to be seeking admission because of the length of her

absence.[13]  In other words, her return to the United States barred

the possibility of a waiver of admissibility.

Petitioner argues that the intersection of § 1101 and § 1182

---

[13] Because of her conviction, Petitioner was considered to be
seeking admission anyway, under § 1101(a)(13)(C)(v).  However,
that subsection provides an exception for the operation of the §
1182(h) waiver.

17

creates an irrational distinction between LPRs within 180 days of eligibility for waiver who leave and do not return until they are eligible and those who return before they are eligible. Because an LPR convicted of a crime of moral turpitude who leaves the United States within 180 days of her seven year anniversary and remains outside our borders until that date arrives is not similarly situated to Petitioner, the Constitution presents no bar to the law's application. The Constitution guarantees the equal treatment of those similarly-situated. It prohibits "different treatment . . . accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute." <u>Eisenstadt v. Baird</u>, 405 U.S. 438, 446 (1972). But, for good reason, where people are not similarly-situated, equal treatment is not required. <u>Kotch v. Bd. of River Port Pilot Comm'rs for Port of New Orleans</u>, 330 U.S. 552, 556 (1947) ("Otherwise, effective regulation in the public interest could not be provided, however essential that regulation might be. For it is axiomatic that the consequence of regulating by setting apart a classified group is that those in it will be subject to some restrictions or receive certain advantages that do not apply to other groups or to all the public."). By virtue of the date she sought admission, Petitioner is distinct from LPRs who have committed crimes of moral turpitude, left the country and not returned until their

seven year anniversary.  She sought admission before § 1182(h)'s period elapsed.  One apparent "object" of § 1182(h) is to condition waiver eligibility (a benefit) on seven years of legal residency.  Whether that time period is the proper one is not this court's concern, for Congress has decided to imbue it with meaning.  That Petitioner sought admission before it elapsed makes her materially-distinct.

There is no indication Petitioner is, in fact, being treated differently from anyone.  On the date she sought admission, August 21, 1999, Petitioner was ineligible for waiver under § 1182(h) regardless of her location and travel plans.  In other words, whether she remained in Mexico was irrelevant because § 1182(h)'s seven year residency requirement operates independently of § 1101's definition of an arriving alien.[14]  Petitioner posits that, had she remained in Mexico through December 13,[15] she would have been eligible.  But she did not.  An immigrant who began his or her lawful permanent residency on the same day as Petitioner and left the United States when she did, but chose to remain abroad would also have been ineligible for waiver if they sought it when Petitioner did.

The group of which Petitioner claims she is a part,

_____

[14]  Of course, had she chosen to remain, the issue of admissibility to the United States would not have arisen.

[15] According to Petitioner, this date is the seven year anniversary of her legal residency.

19

inadmissible LPRs with less than 180 days until they are eligible for waiver who return to the United States, is not so much a classification created by the law as a description of those against whom it works. Whenever a law draws a line which separates those who benefit from it and those who do not, examining a sufficiently narrow "classification" will yield apparent inequities. But the Constitution does not protect against a law having a negative impact. A plaintiff cannot simply tailor their alleged classification to the contours of a statute, ascertain those impacted negatively and establish a denial of equal protection.

Even if one could consider Petitioner similarly-situated to the hypothetical other LPR she posits, our conclusion with respect to equal protection would nonetheless be the same because the classification Petitioner challenges survives rational basis review. She stresses the apparent irrationality of her ineligibility for waiver under § 1182(h) given that, had she stayed in Mexico until the seven-year anniversary of her legal residence in the United States, she would have been eligible. We find no equal protection problem in § 1182(h)'s seven year residency requirement. Congress has an interest in having putative citizens demonstrate their willingness to live in our society and to accept the responsibilities we demand of its members. Nor is § 1101(a)(13)(C)(ii)'s inclusion among those not

20

seeking admission of aliens who have been absent from the United States for up to 180 days problematic.  The provision does distinguish between those gone for 180 days and those gone for longer, but Congress is not forbidden from making such distinctions.  The line drawn by § 1101(a)(13)(C)(ii) reasonably effectuates Congress' goal of allowing LPRs some freedom to travel in and out of the country.  That it does not have the effect of reducing the seven year period in § 1182(h) by 180 days is not troubling for equal protection purposes, and we see no reason to give it such an effect here.

The apparent irrationality to which Petitioner points is the result of the intersection of two valid, and validly and equally applied laws.  In the classic equal protection case, a single law "creates different rules for distinct groups of individuals based on a suspect classification." Wirzburger v. Galvin, 412 F.3d 271, 283 (1st Cir. 2005)(citing Strauder v. West Virginia, 100 U.S. 303 (1879)).  Petitioner's argument does not address one law, but rather what she claims is the odd intersection of two. A rationale exists for each, and there is no suggestion of invidious discrimination in their application (or lack thereof). "The prohibition of the Equal Protection Clause goes no further than . . . invidious discrimination." F.C.C. v. Beach Communications, 508 U.S. 307, 316 (1993) (quoting Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483489 (1955)).

21

What Petitioner seeks is the application of § 1101(a)(13)(C)(ii)'s exception to § 1182(h)'s limitation because she believes it is unfair that, had she stayed in Mexico, she would be eligible for waiver. Perhaps it is unfair; but here reasonable laws are being applied equally, and "equal protection is not a license courts to judge the wisdom, fairness, or logic of legislative choices." Id. at 313.

Petitioner also argues that her ineligibility for a § 1182(h) waiver constitutes a deprivation of substantive due process. Because she has no constitutionally protected liberty interest in eligibility for discretionary relief, see, e.g., Ahmed v. Gonzales, 447 F.3d 433, 400 (5th Cir. 2006), and because the law has a rational basis, Petitioner cannot establish a violation of substantive due process.

V.

For the reasons above, the petition for review is DENIED.

WIENER, Circuit Judge, specially concurring:

I concur in the judgment and in all but one portion of the panel majority's opinion.  Part IV of that opinion analyzes Fuentes's as-applied equal protection challenge to her ineligibility for a waiver of inadmissibility under 8 U.S.C. § 1182(h).  In that Part, the majority first holds that Fuentes's challenge need not be analyzed under equal-protection principles, because Fuentes has not demonstrated how she was treated differently than a similarly situated hypothetical person.  It then holds, in the alternative, that even if Fuentes has demonstrated such differential treatment, the BIA's denial of her eligibility for a § 1182(h) waiver was rational, and thus did not deprive Fuentes of equal protection of the law.

With sincere respect, I cannot disabuse myself of two points of disagreement with the majority's first conclusion —— that Fuentes has not demonstrated treatment distinct from that accorded to a similarly situated person.  First, I am convinced that Fuentes has clearly demonstrated that she was subjected to differential governmental treatment; here's how.

For the sake of simplicity, I refer to Fuentes as "A" and her "twin," the similarly situated hypothetical person, as "B": (1) both A and B became LPRs on the same day, December 15, 1992; (2) in December of 1999, both A and B would have been LPRs for seven years, satisfying § 1182(h)'s temporal pre-requisite; (3) both A and B were convicted of a crime of moral turpitude on July

23

31, 1999; (4) both A and B leave the United States and travel to Mexico on the same day in August of 1999, which is within less than 180 days of reaching § 1182(h)'s seven-year benchmark in December of that year; (5) both A and B remain in Mexico for less than 180 days.  So far, the twins are identical; now for their one distinguishing difference:  A returns to the United States on the same day in August 1999 that she departed (well before the conclusion of her seven-year period), having spent just a few hours in Mexico; B, by contrast, stays in Mexico for roughly four months, not returning to the United States until one day after her seven-year period has run.

Now for more identical features, all these occurring after A's and B's returns from Mexico to the United States.  A and B are each issued notices to appear, charging each with being inadmissible arriving aliens under 8 U.S.C. § 1182(a)(2)(A)(i)(I).  Both A and B appear before an IJ on October 26, 2000, each asserting eligibility to file for a § 1182(h) waiver of inadmissibility.  Notably, by October 26, 2000 — the date on which A and B each seek to demonstrate their eligibility for a § 1182(h) waiver — both A and B have been LPRs for more than seven years.  Thus, even <u>after</u> their returns from Mexico, the <u>only</u> distinguishing fact between the two is that A returned to the United States from Mexico <u>before</u> her seven-year period had run, and B returned <u>after</u> hers had.  That's it: A and

B are identical in every other material respect.

Now for how I perceive Fuentes as having framed her as-applied equal protection challenge to her ineligibility for a § 1182(h) waiver. She based it on the one legally-operative fact that distinguishes her from her hypothetical twin — the different dates on which each returned to the United States. Those dates straddle their shared seven-year LPR anniversaries, A's return was short of it and B's was after it. A and B are otherwise similarly situated.

Second, I am concerned that the majority's strain to conclude that Fuentes is not situated similarly to her hypothetical twin may have broad, if unintended, consequences for future equal-protection challenges to temporal limitations embodied in generally applicable statutes. If, as the majority reasons, Fuentes is not situated similarly to her twin because she sought admission to the United States before her seventh anniversary as an LPR, while her twin sought it after hers, then how can any future litigant who challenges on equal-protection grounds a statutory temporal condition precedent's bar to his receiving a governmental benefit  ever prove that he is similarly situated to someone who, because of a single difference in timing, is eligible for the benefit? Try as I may, I am unable to conceive of a set of facts under which he could. So, unless I am just plain wrong, the practical effect of the panel majority's

25

opinion is to <u>remove</u> from equal-protection scrutiny many temporal limitations embodied in federal and state statutes.  As that result goes too far for me to accept, I cannot concur in it.

I do not, however, differ with the panel majority's alternative holding in Part IV of its opinion —— that even if Fuentes did prove differential treatment (as I believe she did), the BIA's denial of her eligibility for a § 1182(h) waiver did not deprive her of equal protection.  I therefore concur in that holding and in the judgment, satisfied that, for the reasons set forth in the majority's opinion, the differential treatment experienced by Fuentes was rationally related to legitimate governmental interests.